UNITED STATES DISTRICT COURT FILED
DISTRICT OF RHODE ISLAND

2013 JUL -2 P 4: 26

DISTRICT COURT

| | |
|---|---|
| WILLIAM NAUGHTON and MARIA HORRIDGE, | * * * * |
| Plaintiffs, | * * C.A. No. |
| v. | * CA 13- 507 M |
| GILBANE, INC. and UNITED STATES OF AMERICA through the VETERANS ADMINISTRATION, | * * * |
| Defendants. | * * |

## COMPLAINT

Plaintiffs file this complaint to recover for personal injury resulting from the unsanitary and harmful conditions which existed at the Providence Veterans Hospital as a result of the intentional, negligent and discriminatory conduct and other actions of the Veterans Administration, their representatives, and Gilbane, Inc. ("Gilbane").

## PARTIES

1. William Naughton is a physician who practices at the Providence Veterans Administration Hospital. He resides at 100 Old Homes Lead Road, Warwick, Rhode Island.

2. Maria Horridge is a technician who works at the Providence Veterans Administration Hospital. She resides at 18 Wilshire Way, Coventry, Rhode Island.

3. The Veterans Administration is an agency of the United States of America. It maintains an office at 830 Chalkstone Avenue, Providence, Rhode Island.

4.  Gilbane is a corporation with a principal place of business located at 7 Jackson Walkway, Providence, Rhode Island.

## JURISDICTION AND VENUE

5.  Jurisdiction exists under 28 U.S.C. § 1336(b)(1) and principles as to pendent jurisdiction.

6.  Venue is appropriate under 28. U.S.C. § 1392 (b).

## ALLEGATIONS

7.  The Providence Veterans Administration Hospital (the "Hospital") is located at 830 Chalkstone Avenue, Providence, Rhode Island.

8.  Each of the plaintiffs serve as either a physician or technician at the hospital.

9.  Dr. Naughton and Ms. Harridge worked in the podiatry clinic.  The clinic had been and continues to be located in First Floor Wing B of the hospital.

10.  Gilbane has been performing major construction work at the hospital.

11.  Its work has included efforts to construct a specialty clinic unit.  The work also has included repainting the brick exterior of the building, electrical work, demolition, heating and plumbing work, interior construction, duct work, air conditioning work, and other work as well.

12.  Gilbane performed brick fabrication directly outside the area where the podiatry clinic had been located.

13.  Gilbane failed to install any measures to protect the physicians, nurses, technicians, and patients using or visiting the podiatry clinic while the construction had been ongoing.

14.  The Veterans Administration also intentionally refused to take any such action.  They also failed to direct that the work occur at hours when the clinic had not been in operation.

15.  The clinic had been in operation only from 8:00 a.m. to 4:00 p.m. each day. The Veterans Administration stated it did not want to pay the construction employees overtime.

16.  As a result of the construction work, the podiatry clinic became unsanitary, inundated with dust and unsafe.

17.  The brick repainting work, plaster removal, duct work, interior work, demotion, and other work created massive amounts of dust.

18.  The dust entered and continues to enter the podiatry clinic in various ways.

19.  One way had been through air openings to the outside of the building from construction equipment.  These openings had been covered with filters

20.  The covers had been removed only to facilitate air conditioning for several days.  A true and accurate copy of an e-mail selling forth that contention is attached as Exhibit A.

21.  Gilbane knew that the covers needed to be replaced.  It, however, never replaced the outside filters.  Accordingly, from the podiatry clinic one could view the outside by merely looking through the air conditioner.

22.  Accordingly, dust streamed into the podiatry clinic as a result of the construction.  No protection existed.

23.  Dust also flowed in through the access doors.  They never had been sealed. The dust flowed into the treatment rooms.

24. Dust also flowed in through the windows which also had not been sealed.

25. Gilbane also placed internal air conditioners in the treatment rooms. Gilbane, however, vented the exhaust of the air conditioners into ceiling.

26. As a result, draft from the area above the ceiling tiles flowed into the clinics.

27. Doing so accumulated dust which covered many areas.

28. The individuals serving in the podiatry clinic contacted the hospital's administration numerous times.

29. Each time the administration ignored the complaints. The administration simply wanted the clinic to remain in operation. The administration, through Christopher Newton, indicated that the hospital could not close down a busy clinic which prevented revenue and provided benefits to the compensation of the administration.

30. The administration wanted the clinic to continue generating revenue. The revenue fueled the bonuses of the hospital administrators.

31. The situation became so bad that the individuals working in the podiatry clinic asked for inspections by the VA's Infection Preventiologist.

32. The Infection Preventologist, Ms Trice, conducted an inspection. She then ordered that the clinic be shut down or moved to another facility. A copy of an email evidencing Ms. Trice's order is attached as Exhibit B.

33. Ms. Trice had communicated her order to Chris Newton and Vincent Ng.

34. Mr. Newton served as the surgical administator at the hospital.

35. Mr. Newton reported to Dr. Michael Vezerdis. He acted as the Chief of Surgery. He took no action even though he had been fully aware of the issues.

36. Dr. Ng served as the Director of the Providence Veterans Administration Hospital.

37. All ignored the order. They told the physicians and others working in the clinic that the clinic had been safe. The refused to shut down or move the clinic.

38. The condition of the clinic had not been remedied. It worsened.

39. The hospital then indicated that it would move the clinic because of its conditions. The hospital indicated that it would do so "in the best interest of both patients and the providers and staff." A true and accurate copy of an e-mail setting forth that position is attached as Exhibit C.

40. The hospital, however, did nothing. It forced the clinic to keep operating in its squalid and unsafe condition.

41. The hospital knew the conditions to be unsafe to physicians, staff and veteran patients. It also knew that the conditions had caused and had been continuing to cause injury to all of those individuals.

42. As part of its efforts to claim falsely that the construction posed no risks, the hospital published an agenda to the Director's staff while falsely stated: "inside air quality is essentially the same as outside air quality." A true and accurate copy of the news letters is attached as Exhibit D. That statement had been untrue and the administration knew it to be false.

43. Gilbane also knew of the conditions existing in the podiatry clinic. It took no action because the Administration compelled no action. It knowingly continued to worsen the condition in the clinic. It also knew of the harm which it had been causing to physicians, nurses and patients. It simply did not care.

44. The conditions worsened. The harm to the podiatry clinic physicians and staff worsened.

45. The physicians and staff intended to file forms stating injuries suffered as a result of the harmful condition. Chris Newton told them not to file the forms. He indicated all would be denied.

46. The condition remained deplorable. One physician reported the continued existence of large amounts of dust in the clinic. True and accurate copies of photographs of the condition are attached as Exhibit E.

47. The physician also reported three of the conditions had caused him to develop a full body rash. He also reported severe allergic symptoms.

48. On February 22, 2012, Dr. Naughton reported via e-mail his serious and degrading medical condition caused by the conditions to Muhammad Anir. Dr. Anir had been tasked with reviewing the podiatry clinic. A true and accurate copy of Dr. Naughton's message to Dr. Anir is attached as Exhibit F. Gilbane also had been aware of these effects.

49. The podiatry clinic also had been subject to mold infestation. Mold had grown inside the area above the ceiling tiles and had been apparent and growing on the outside of those tiles.

50. The administration precluded the physicians and staff from removing tiles to investigate the tops as to mold as well as the area existing above the tiles. The mold on the outside of the tiles made it apparent that much more significant mold existed above

the tiles. True and accurate copies of photos depicting the mold are attached as Exhibit G.

51. The clinic also had become infested with mice. Mice droppings existed in the clinic. True and accurate copies of such drippings in clinic files are attached as Exhibit H.

52. The hospital refused to clean much of the premises. Blood and portions of human tissue remained on the floor and equipment for days if not longer. Attached as Exhibit I are true and accurate copies of photos depicting areas of blood and tissue which had remained on the floor for days.

53. The hospital administrators and Gilbane refused to do anything to improve the squalid, unsanitary and unsafe conditions existing in the podiatry clinic.

54. The situation worsened.

55. In August 2012, the clinic became subjected to a strong and noxious smell. A physician communicated this odor to administration. A true and accurate copy of his email is attached as Exhibit J.

56. The odor had been generated by a noxious and upon information and belief, toxic substance.

57. The substance in the air caused one physician to bleed readily from his nose. He could not stop the bleeding.

58. Other employees in the unit reported severe headaches. Many had a metallic taste in their mouths.

59. Many suffered from red and burning eyes.

60. The situation continued and the odor and its effects occurred repeatedly. Again one physician reported the condition to administration. The administration refused to take any action.

The Emanating Chemicals Are Dangerous and Cause<br>Permanent Nerve, Brain and Other Injuries.

61. The odors present in 2012 and at other times emanated from chemicals used during construction.

62. Those chemicals had been hazardous and extremely dangerous.

63. Construction workers would encounter these chemicals only when wearing breathing protection equipment.

64. No such equipment ever had been provided to the employees in the podiatry clinic. The hospital and Gilbane knowingly subjected them to the harm inflicted by the chemicals.

65. The chemicals included Hydrogen Chloride, Ethyl Benzyne, Xylene, Sodium Sulfates, Crystalline Silica as well as other substances.

66. One chemical solution used as to treatment of the area where construction occurred provided numerous health hazards.

67. They included respiratory tract irritation, burning, choking, headaches, and rapid heart beat.

68. The chemical destroyed nasal passages and caused breathing difficulties. All of the individuals in podiatry suffered these effects. True and accurate copies of chemical safety data sheets listing those hazards are attached as Exhibits K & L.

69. Such hazards caused by high concentrations included bleeding of the nose and ulceration of nasal passages. Hospital physicians had suffered such harm.

70.  Hydrogen Chloride, Ethyl Benzyne and other chemicals affected the nervous system.  Headaches, fatigue, drowsiness, and loss of coordination would result.   A true and accurate copy of a Material Safety Data Sheets setting forth these effects is attached as Exhibits K & L.  Physicians, nurses, technicians and patients have suffered these effects.

71.  Overexposure to such chemicals caused depression and permanent brain and nervous system damage.  A true and accurate copy of a Material Safety Data Sheets setting forth these effects is attached as Exhibit K & L.

72.  Gilbane also sprayed Mastic on the brickwork located on the outside of the building.

73.  The construction workers wore breathing protection gear when they sprayed Mastic on the brickwork.

74.  The Mastic, however, flew directly into the podiatry clinic through openings in the walls. Filters had not been placed in those openings.

75.  Accordingly, the plaintiffs, other employees and veteran patients became inundated with the mastic compound.

76.  When overexposure occurs as to that compound it causes permanent brain damage and nervous system impairment.  Exposure also causes headaches, depression, and other effects.  A true and accurate copy of a chemical safety data sheeting setting forth these hazards is attached as Exhibit M.  Physicians, nurses, technicians and patients have suffered such effects.

77.  Certain relevant compounds which had been used and exposed to employees and patients in the podiatry clinic also had been carcinogenic.  A true and accurate copy of a chemical Safety Data Sheet setting froth those hazards is attached as Exhibits N.

78.  In connection with the exposure of the employees and patients to these chemicals, the hospital made no reports as required under the Rhode Island regulations reporting communicable environmental and occupational diseases.

79.  The hospital and Gilbane also failed to report the exposure of employees and patients to silica as is required by federal regulations.

80.  Silica exposure also had been hazardous because it causes chronic obstructive pulmonary disease.  An article discussing this effect is attached as Exhibit O.

81.  When any of the plaintiffs took action to report conditions to cause them to be cured the administration simply refused.

<u>Dr. Naughton Suffers Permanent Physical Harm.</u>

82.  Moreover, these conditions caused Dr. Naughton to suffer severe effects as to his breathing disability.

83.  The conditions caused him to be unable to breath.  They caused him to obtain the onset of chronic obstructive pulmonary disease.

84.  His condition worsened with each day he worked at the hospital.

85.  As a result, Dr. Naughton made a request for a reasonable accommodation. A true and accurate copy of the request is attached as Exhibit P.

86.  When Dr. Naughton made this request he had been seeing a doctor for numerous months.  He had been placed on medication which caused him to gain more than twenty pounds.

87. In the office he could not breathe.  He constantly maintained a condition where he suffered respiratory distress.

88. The hospital administration knew the effects which the podiatry clinic conditions had imposed on Dr. Naughton.

89. They, however, denied his request for an accommodation.

90. The administration denied Dr. Naughton's request because they simply did not care that he suffered from conditions which had been causing him permanent and disabling harm.

91. There also is no question that the condition did cause permanent harm.

92. Dr. Naughton's physician, Dr. Donat, kept Dr. Naughton out of work for several months.  Dr. Naughton's condition improved.

93. Dr. Donat sent Dr. Naughton back to work.  Dr. Naughton's condition degraded rapidly and considerably.

94. Dr. Donat then ordered Dr. Naughton to stay out of work. Dr. Naughton's condition improved considerably.

95. As a result of the above and his examination of Dr. Naughton, Dr. Donat has opined that the hospital conditions have caused Dr. Naughton to be harmed significantly. A true and accurate copy of his opinion is attached as Exhibit Q.

96. Dr. Donat has told Dr. Naughton that he believes the harm which he has suffered is permanent.

97. Such permanent harm relates to Dr. Naughton's ability and capacity to breath.

98. Dr. Donat also has told Dr. Naughton that he would be lucky to reach the age of fifty based on the harm which he has suffered at the hospital.

99. Dr. Naughton has tried to obtain disability leave.  The hospital has refused Dr. Naughton to go on disability.

100. The hospital's actions have been not only wrong but vindictive.

101. Dr. Naughton would need to quit.

102. He, however, had sacrificed much of his private practice to work at the hospital.

103. He would be unable to support his family if he quit.  He also has a special needs son who needs insurance as to treatment.

104. To compound its abuse of Dr. Naughton the hospital then refused to promote him to lead the podiatry unit.

105. Dr. Naughton had been most qualified to fill that position.

### The Veterans Administration Hires Dr. Driver to Run the Clinic.

106. Instead the hospital hired Dr. Driver.

107. She, however, lacks any skill in the area of podiatry.

108. She has failed to provide adequate patient care.  Oftentimes her treatment is deficient.

109. Her treatment often leads to a degradation as to the condition of her patients. Many suffer injuries and harm as a result of her care which often times is below the standard of care.

110. She lacks any managerial skills.  Her performance has been deplorable.

### Maria Horridge

111. Maria Horridge is a technician who works in the podiatry unit.

112. The conditions have caused her to suffer headaches, rashes, and red and irritated eyes.

113. She has suffered fatigue and continues to suffer from depression.

114. She also has suffered permanent disability and other harm.

115. She has obtained these conditions because of her exposure to the chemicals and unsanitary conditions at the hospital. She is aware of no other reason.

The Hospital Administration Is Corrupt and Had Been Disciplined
Several Times for Financial Misdeeds at Other Hospitals.

116. Vincent Ng has served the VA on various capacities for numerous years.

117. During that period he has been disciplined for financial misconduct which had caused funds to flow inappropriately into his own pocket.

118. In February 2011, the VA determined that Mr. Ng had misappropriated funds while acting as the director of the VA hospital in Providence, Rhode Island. A true and accurate copy of articles as to this misdeed is attached as Exhibits R & S.

119. The article noted that "lapses in management" lead to the inappropriate supplementation of pay to various individuals who included Mr. Ng.

120. At other locations, Mr. Ng also had used government vehicles for personal transportation, used government funds to renovate his porch, and used government funds to purchase personal airline tickets. A copy of the VA report conducted as to Mr. Ng is attached as Exhibit T.

121. Mr. Ng acted to inflate his own salary at the Veterans Hospital in Providence. That salary had been based on the amount of care the VA hospital in Providence provided.

122. To manage that care he needed to ensure the podiatry unit continued to operate.

123. That facility serviced thousands of patients. Absent those services, his salary would have been impacted detrimentally.

124. Accordingly, he would not engage in any efforts to reduce care on the basis of safety as health concerns. Mr. Ng simply wanted to increase his pay.

<u>The Administration Did Not Permit VA Inspectors to View Podiatry Clinic.</u>

125. The egregiousness of Mr. Ng's and the hospital's behavior had been highlighted during the VA's inspection of the Providence VA hospital in 2012.

126. During that inspection, Mr. Ng and the hospital administration caused the inspectors to avoid visiting the podiatry clinic.

127. They did not want the VA to encounter the unsanitary, unsafe and harmful conditions in that area.

Count I
<u>(Rehabilitation Act Violation and Disability Discrimination as to Dr. Naughton)</u>

128. Dr. Naughton incorporates the allegations of Paragraph 1 through 127 as if fully stated herein.

129. Dr. Naughton has suffered from a condition, handicap, and disability which have substantially limited major life activities which include, without limitation, breathing, engaging in numerous activities and other events in his personal life.

130. Dr. Naughton is able to perform the essential functions of his position.

131. Defendants never offered Dr. Naughton any accommodation as to his condition and handicap.

132. As a result, Dr. Naughton has suffered damages exceeding $300,000.

14

Count II
(Negligence – Against Gilbane by All Plaintiffs)

133.  Plaintiffs incorporate the allegations of Paragraph 1 through 132 as if fully stated herein.

134.  Gilbane possessed a duty to act reasonably and to make the Podiatry Clinic safe.

135.  Gilbane breached that duty by knowingly making the podiatry clinic and surrounding area unsafe.

136.  Gilbane also knew that its behavior had been causing harm to doctors, nurses, technicians, and patients.

137.  As a result, the Plaintiffs have been damaged in an amount to be determined at trial.

Count III
(Intentional Infliction of Emotional Distress by All Plaintiffs as to Gilbane)

138.  Plaintiffs incorporate the allegations of Paragraph 1 through 137 as if fully stated herein.

139.  Defendant had a duty not to impose emotional distress on plaintiff.

140.  It breached that duty.

141.  Defendant did so through intentional and outrageous acts which they knew would cause extreme emotional distress.

142.  As a result, Plaintiffs are entitled to recovery of an amount exceeding $100,000.

WHEREFORE, Plaintiff prays that the court:

1. Enter judgment in favor of Dr. Naughton and against the United States on Count I in an amount to be determined at trial;

2. Enter judgment in favor of Plaintiffs and against Defendants on Count II in an amount to be determined at trial;

3. Enter judgment in favor of Plaintiffs and against Defendants on Count III in an amount to be determined at trial;

4. Award Plaintiffs interest and costs, which include attorneys' fees;

5. Award Plaintiffs punitive damages; and

6. Award such other and further relief as the Court deems appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

WILLIAM NAUGHTON and
MARIA HORRIDGE,

By their attorney,

LAW OFFICE OF
CHRISTOPHER J. TROMBETTA

Christopher J. Trombetta (BBO No. 6549)
310 North Main Street, Suite 6
Mansfield, MA  02048
(508) 339-5900

Dated:  July 1, 2013